# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RICHELLE A. BARKER, | ) | 1:09-cv-00184 AWI GSA |
| | ) | |
| | ) | FINDINGS AND RECOMMENDATIONS |
| Plaintiff, | ) | REGARDING PLAINTIFF'S SOCIAL |
| | ) | SECURITY COMPLAINT |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## **BACKGROUND**

Plaintiff Richelle A. Barker ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge, for findings and recommendations to the District Court.

//

//

//

**FACTS AND PRIOR PROCEEDINGS**[1]

Plaintiff filed her application on or about July 12, 2006, alleging disability beginning November 7, 2005. AR 66-68. Her application was denied initially (AR 61-65) and on reconsideration (AR 55-59), thereafter Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 53. ALJ Bert C. Hoffman held a hearing on April 3, 2008 (AR 314-343) and issued an order denying benefits on August 19, 2008. AR 13-23. Plaintiff requested a review of the hearing (AR 8-9) and the Appeals Council denied review. AR 5-7.

**Hearing Testimony**

ALJ Hoffman held a hearing on April 3, 2008, in Fresno, California. Plaintiff appeared and testified. Plaintiff was represented by attorney Dennis Bromberg. AR 314-343.

Plaintiff was born June 8, 1970. AR 317. She is 5' 3", weighs 120 pounds, and is right-handed. AR 317. Plaintiff graduated from high school and completed one year of college. AR 317. Plaintiff has four children, three of whom live at home. AR 327-328.

Plaintiff was last employed as an escrow assistant in 2005. AR 318. The position primarily involved "desk work" and required sitting a majority of the time, lifting computers and boxes of files occasionally, and lifting individual files frequently. AR 318. Previous to the escrow assistant position, Plaintiff was employed as an office administrator for a real estate company. AR 318. This position also involved "desk work," with some lifting of files and about two hours of driving per day. AR 318-319. Plaintiff worked as a waitress in 1995, 1996, and 1998. AR 319. She carried trays and bussed tables, which required lifting about 40 to 45 pounds. AR 319. Plaintiff was also previously employed as an accounts manager in a dental office. AR 320. This work was largely sedentary and required Plaintiff to explain the cost of treatment to patients and perform collections. AR 321. Plaintiff also worked full-time in a daycare facility. She was on her feet all day, changing diapers, and lifting children ranging in age "from six weeks to thirteen [years]." AR 321-322. Plaintiff also worked for Orange Julius as a young adult. AR 319-320.

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

When asked about depression, Plaintiff indicated she has had problems since early 2006 when she stopped working. AR 322-323. She has not been sleeping well since early 2007. More particularly, her sleep is interrupted and typically totals four to five hours per night. AR 323-324. Plaintiff complained of low energy levels and indicated that she has been eating only one meal per day for the last three years. AR 324. Her ability to concentrate and maintain focus and her short-term memory are "not very good." AR 325. She denied thoughts of suicide. AR 325.

Plaintiff suffers from anxiety attacks that last between 30 minutes and one hour, but does not know what causes them. AR 326. The attacks used to occur two to three times per week, until her doctor prescribed Lorazepam. AR 327. Now the attacks occur about twice per month. AR 326. Plaintiff has not wanted to leave the house by herself for about one year, although her medication is helping with this. AR 329. She has tried to go out by herself but her stomach "does bad things to her." AR 329. Plaintiff's son usually accompanies her when she leaves the house to go shopping or attend a doctor's appointment. AR 328. People visit her, such as her mother, father, and brother. She has a friend that does her hair once every three months. AR 339. Currently, Plaintiff is not receiving any mental health treatment other than "the pill," prescribed by her primary doctor, Dr. Alegarbes,[2] at Valley Family Health Center in Armona. AR 339-341. Dr. Alegarbes has been her doctor since late 2006. AR 340.

Plaintiff has back pain just below her waist, on both sides. AR 330. The pain has been constant since 2005. AR 331. Bending, walking, sitting, standing for too long, and lying down can make the pain worse. AR 331. The pain radiates down her left leg to her knee; it occurs randomly, about twice per week, and lasts for an hour or more. AR 333. Plaintiff also fractured her foot in January 2008 when she was walking her dogs. AR 337.

When asked how long she could stand without pain, Plaintiff indicated she could do so for about 30 to 45 minutes at one time. AR 332. She can walk for 20 minutes before she has to get off of her feet and can sit for about 15 minutes at one time. AR 332. Plaintiff uses aromatic

---

[2] The transcript of the hearing reflects Dr. "Ella Garvis," which was spelled phonetically by the transcriber. Plaintiff's primary treating physician at the time was Dr. Alegarbes. AR 264-293.

3

heating pads and prescription medication to treat her back pain. AR 332. The medication however does not help with the pain in her left leg. AR 334. She currently takes Lorcet and Soma. AR 333. When she goes to the hospital for the pain, she gets Oxycontin to replace the Lorcet. AR 333. Plaintiff experiences side effects of "some dizziness, some drowsiness, [and] some kind of emptiness" when she takes her medication. AR 333.

Plaintiff has discussed surgery with her doctors, but Dr. Watson, an orthopedic surgeon she saw in March 2008, told her she was not a candidate due to osteoporosis. AR 334. She was not referred to Dr. Watson by another physician, rather she just scheduled a consultation. AR 335.

Plaintiff is treated for thyroid disease. AR 335. She was treated by a doctor in Tampa, Florida, who completely removed her parathyroid gland after a parathyroid tumor was found. AR 336. She found the Florida physician on the internet after learning from physicians at Stanford that the surgery risks included the loss of her voice and an eight inch scar. AR 336. She chose the Florida doctor because he had invented a minimally invasive procedure that gave her a "99 percent chance of speaking" after the operation.

When asked about her average day, Plaintiff stated she does not do very much during the day. AR 336. She does the dishes and makes her bed. AR 336. Occasionally she does some laundry, but she does not do any vacuuming, mopping, or sweeping. AR 336-338. She gets her daughters ready for school and then watches television all day. AR 336. Plaintiff does go grocery shopping, but the kids go with her. For the last several years, she has had to use a motorized cart or scooter to shop. AR 337. Once in a while she goes to her daughters' softball games. AR 338.

**Medical Record**

The entire medical record was reviewed by the Court. Those records relevant to the issues on appeal are summarized below. Otherwise, the medical evidence will be referenced as necessary in these findings and recommendations.

### *Dr. Rudolph*

On December 13, 2005, Plaintiff was seen by Dr. Rudolph at Central Valley Comprehensive Care because "her back went out."[3] Dr. Rudolph noted that Plaintiff had a history of degenerative disc disease. Plaintiff was given Demerol, Phenergan, Lorcet, and Soma. AR 155.

On March 3, 2006, Plaintiff was seen for complaints of increased lower back pain. She was in a wheelchair. The doctor noted "back pain due to nerve root impingement" and prescribed Demerol. AR 151.

On March 13, 2006, Plaintiff was seen for complaints of lower back pain. She stated that the Oxycodone did not help and gave her an upset stomach. She was encouraged to take medication for depression and was prescribed Lexpro. The treatment notes indicate the doctor discussed with Plaintiff that she take no more than four Loracet per day. AR 150.

In April 2006, Plaintiff requested an increase in the quantity and dosage of her Loracet and Soma prescriptions. Dr. Rudolph requested that she sign a drug contract. She refused. Dr. Rudolph denied her request and discharged her from the practice. The doctor's records also note that she was seeing three outside doctors and going to the emergency room for treatment. AR 149.

### *Central California Imaging Center*

On January 23, 2006, Donald C. Wheeler, M.D. performed an MRI of the lumbar spine at the request of Dr. Riddle. The MRI showed a three to four millimeter broad-based disc protrusion at L4-5 associated with a tear of the annulus fibrosis. The disc abutted both the L4 and L5 nerve roots bilaterally. The MRI was otherwise unremarkable. AR 139-140.

### *Thomas E. Hoyt. M.D.*

On February 27, 2006, Plaintiff was examined by neurologist Thomas E. Hoyt, M.D. at the request of Dr. Riddle. Dr. Hoyt determined that Plaintiff had left L5 radiculopathy and that her symptoms were consistent with neurogenic claudications suggesting lumbar stenosis. He

---

[3] Dr. Rudolph was Plaintiff's primary treating physician at Central Valley Comprehensive Care, but she was also seen by other physicians and assistants. AR 148-159.

found surgical intervention unnecessary. He noted a "disconnect between [Plaintiff's] clinical presentation and the MRI." He ordered an EMG in both legs, a lumbar myelogram, and a post myelo CT scan. AR 141.

On April 18, Plaintiff saw Dr. Hoyt for a follow-up appointment. Dr. Hoyt reported that the EMG was a normal study. The findings showed no radiculopathy or peripheral neuropathy. The myelogram was also normal. The CT myelogram showed lack of filling on the right side at L4-5. There was also incomplete filling of the left nerve root, but without mass effect. Dr. Hoyt suspected a conjoint nerve root rather than a herniated nucleus pulposus. He did not see an explanation for Plaintiff's left leg pain that would require surgical intervention. AR 174.

*Calvon Voong, M.D.*

On March 29, 2006, Plaintiff was examined by Calvon Voong, M.D., at the request of Dr. Riddle, for lower back pain. Dr. Voong diagnosed lumbar disc degeneration and gave Plaintiff a lumbar epidural steroid injection to reduce pain and improve mobility in the L4-5 area. AR 177-180.

On April 4, 2006, Plaintiff was seen by Dr. Voong for a follow-up appointment. She indicated that she had been to the emergency room the night before and received a pain injection. Dr. Voong noted moderate pain and discomfort from L4 to the ilium bilaterally with palpation. Lorcet and Soma were prescribed. Ar 175.

On June 16, 2006, Plaintiff was seen for a follow-up appointment and reported that the lumbar transforaminal steroid injection provided minimal relief. AR 171.

*Frank L. Feng, D.O.*

On June 13, 2006, Plaintiff was seen by orthopedist Frank L. Feng for complaints of back pain and bilateral leg pain. AR 184C-194. On the subjective questionnaire, Plaintiff reported that her injuries were due to an automobile accident that occurred on October 7, 2003. AR 189. She indicated the pain prevented her from walking more than 10 minutes, sitting or standing more than 30 minutes, and lifting anything. AR 190-191. However, she could dress herself. AR 191. The pain also had restricted her social and recreational life, restricted her to trips of less

than one hour, prevented any sex life at all, and often interrupted her sleep.  AR 191-192.  She was taking Lorcet, Soma, and Levoxyl.  AR 192.

In response to the mental health questions, Plaintiff responded that she was not a very nervous person, had been a happy person and had a happy childhood, and had not felt downhearted or blue.  AR 194.  However, when asked about her past medical history, Plaintiff placed a check mark next to "Depression."  AR 192.

Dr. Feng reviewed Plaintiff's January 23, 2006 MRI and opined that it showed disc dessication with high intensity zone lesion at L4-5, but revealed no evidence of central foraminal stenosis.  AR 186.  Dr. Feng diagnosed Plaintiff with a transitional lumbar segment at L6, degenerative disc disease at L5-6, and symptomatic lumbar facets at L3-4 and L4-5.  AR 186.  He recommended diagnostic and anesthetic injection to block the facets at L4-5 and L5-S1.  AR 186.

On June 29, 2006, Dr. Feng administered bilateral L3-4, L4-5, and L5-S1 facet blocks to treat Plaintiff's symptomatic lumbar facets.  The operation was otherwise unremarkable and there were no complications.  AR 182.

### *Central Valley General Hospital*

On October 21, 2006, Plaintiff was admitted to the emergency room at Central Valley General Hospital for complaints of back pain.  The clinical impression included acute myofascial strain, chronic low back pain, and acute herniated disc at L4-5.  She was prescribed Toradol, Norflex, and Dilaudid and released shortly thereafter.  AR 260-263.

### *Physical RFC Assessment*

On September 20, 2006, state agency physician Ernest E. Wong, M.D. completed a Physical Residual Functional Capacity ("RFC") Assessment.  AR 208-215.  The doctor determined that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently, stand or walk for a total of about six hours per day, and sit for a total of about six hours per day.  AR 209.  The doctor also determined that Plaintiff had no limitation to push or pull, could occasionally climb, and could frequently balance, stoop, kneel, crouch, and crawl.  AR 209-211.  The doctor found no manipulative, visual, communicative, or environmental limitations.  AR 211-212.

***Pinky Alegarbes, M.D.***

On January 30, 2007, Plaintiff was seen by her treating physician, Pinky Alegarbes, M.D., at Valley Family Health Center, for anxiety about upcoming surgery. AR 289.

On February 27, 2007, Plaintiff was seen for a follow-up and prescription review. Plaintiff reported she felt more energized after a parathyroidectomy procedure. AR 288.

On April 24, 2007, Plaintiff was treated by Dr. Alegarbes for complaints of back pain, vomiting, diarrhea, and nausea. AR 283.

On May 22, 2007, Plaintiff was seen for continued complaints of lower back pain. She stated her pain was a ten out of ten but there was no pain radiation. Plaintiff stated she was having a lot of family problems recently. Her motor and sensory strength was intact and straight leg raising was normal. AR 281.

On July 10, 2007, Plaintiff was seen for complaints of lower back pain. She assigned her pain a nine out of ten, but indicated the pain is well-controlled by Lorcet. The examination findings were otherwise normal. Plaintiff was prescribed Ambien for insomnia. AR 277.

On July 31, 2007, Plaintiff was treated for complaints of lower back pain due to an injury that occurred while doing laundry. Dr. Alegarbes prescribed a Lidoderm patch and recommended warm compresses and gentle massage. AR 276.

On November 6, 2007, Plaintiff was seen by Dr. Alegarbes for medication refills and an influenza shot. Plaintiff was anxious but declined to take an SSRI[4] because she felt she could manage her anxiety without it. AR 275.

***Michael S. Barnett, M.D.***

On May 8, 2007, Michael S. Barnett, M.D., a psychiatrist, performed a consultative psychiatric evaluation of Plaintiff. Dr. Barnett noted that she has low thyroid, back pain, and osteoporosis. AR 237. Plaintiff reported to Dr. Barnett that for the last three or four years, she has had panic attacks when she or her children leave the house. She had difficulty falling asleep and woke up mid-cycle, about twice per week for the last five years. She also reported decreased

---

[4] Selective Serotonin Reuptake Inhibitor

appetite, low energy, and poor concentration. She cried twice per week but denied suicidal ideations or suicide attempts. AR 237. Plaintiff had been prescribed Levoxyl, Lorcet, Ambien CR, Sonata, Xanax, calcium, and Boniva. AR 237. She was able to dress and bathe herself, cook and clean, do laundry, and go grocery shopping rarely. She reported that she did not go out of the house to visit anyone but people do visit her about twice a month. AR 237.

Dr. Barnett conducted a mental status exam. He stated that Plaintiff was anxious and cooperative, and in mild psychic distress. Her responses were relevant, coherent, and organized. Her mood was depressed and her affect was blunted. Her recent memory was intact. She could repeat digits, name presidents, identify states, do multiplication, and make change for a dollar. She could also recall objects, interpret proverbs, and know what to do if there was a fire in a movie theater or if she found a stamped envelope on the sidewalk. AR 238.

Dr. Barnett diagnosed Plaintiff with dysthymia, panic attacks with agoraphobia, and chronic post-traumatic stress disorder. Dr. Barnett also assigned Plaintiff a GAF score of 55.[5] AR 238.

Dr. Barnett's medical source statement contained the following finding:

> Aside from educational limitations, what keeps [Plaintiff] from working is her severe anxiety and chronic depression. These symptoms may or may not be related to her history of physical abuse by the mother, however, the symptoms would prevent her from doing work-related tasks in an eight-hour work situation. Treatment with a SSRI medication and adequate doses of anti-anxiety medication would relieve her symptoms. Ninety-five percent of people treated for these symptoms experience relief. [Plaintiff] would be able to understand and remember simple or complex work-related instructions and tasks. [Plaintiff] would not be able to sustain focused attention and concentration long enough to complete routine work-related tasks in a timely and appropriate way without special or additional supervision because of her anxiety and depression. [Plaintiff] would have difficulty being able to interact independently, appropriately and effectively with coworkers, supervisors, and the public for the same reasons. [Plaintiff] would have difficulty adapting to changes, hazards or stressors in the work environment due to her anxiety and depression symptoms.

AR 238-239.

---

[5] The Global Assessment of Functioning or "GAF" scale reflects a clinician's assessment of the individual's overall level of functioning. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 2000) ("DSM IV"). A GAF between 51 and 60 indicates "[moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers). DSM- IV at 34.

*Mental RFC Assessment*

On June 8, 2007, state agency psychiatrist, E. B. Aquino-Caro, M.D., completed a mental RFC assessment. Dr. Aquino-Caro determined that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, and moderately limited in her ability to interact appropriately with the general public. AR 252-253. However, Dr. Aquino-Caro determined that Plaintiff was able to understand, remember, and carry out simple instructions, sustain attention and concentration for extended periods, relate and interact appropriately with limited public contact, and adapt to usual work situations and deal with changes in a routine work setting. AR 254.

**ALJ's Findings**

The ALJ found that Plaintiff has not engaged in substantial gainful activity since November 7, 2005, and has the severe impairments of lumbar degenerative disc disease and dysthymia.[6] AR 15. Nonetheless, the ALJ determined that the severe impairments do not meet or exceed one of the listed impairments. AR 15.

Based on his review of the medical evidence, the ALJ determined that Plaintiff has the RFC to lift and carry 20 pounds occasionally and ten pounds frequently. She is able to stand and/or walk a total of six hours and sit for six hours in an eight-hour workday. Plaintiff is able to perform all of the mental activities of work except that she requires a job with limited public contact. AR 16.

The ALJ determined that Plaintiff is unable to perform any past relevant work. AR 22. The ALJ determined that Plaintiff is a younger individual, has at least a high school education, and is able to communicate in English. AR 22. Transferability of job skills was not material to the determination of disability because Plaintiff was "not disabled" whether or not she has transferrable job skills. AR 22. The ALJ further determined that, considering the Plaintiff's age,

---

[6] The American Psychiatric Association defines dysthymia as depressed mood for most of the day, for more days than not, as indicated either by subjective account or observation by others, for at least 2 years, and the presence, while depressed, of two (or more) of the following: (1) poor appetite or overeating; (2) insomnia or hypersomnia; (3) low energy or fatigue; (4) low self-esteem; (5) poor concentration or difficulty making decisions; (6) feelings of hopelessness. DSM-IV-TR at 380-381.

education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. AR 22. Accordingly, the ALJ found that Plaintiff was not disabled, as defined in the Social Security Act. AR 23.

## **SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## **REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

11

The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) could not perform her past relevant work; and (5) could perform jobs that exist in significant numbers in the national economy. AR 15-22.

Here, Plaintiff argues that the ALJ did not properly assess the physician opinion evidence and that the ALJ erred in concluding that Plaintiff's limitation regarding public contact has little or no effect on the occupational base of unskilled light work without hearing from a Vocational Expert ("VE").

## DISCUSSION

### A. *Rejection of Dr. Barnett's Opinion*

Plaintiff argues that the ALJ did not properly assess the physician opinion evidence. Specifically, Plaintiff argues that the reasons offered by the ALJ for rejecting the opinion of examining physician Dr. Barnett are not clear and convincing and are not supported by substantial evidence. Defendant argues that the ALJ properly interpreted the physician opinion evidence and that the ALJ's RFC assessment was supported by substantial evidence.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987). At least where the treating doctor's opinion is not contradicted by another

doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55 (9th Cir. 1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians . . .." *Magallanes*, 881 F.2d at 752 (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

Here, examining physician Dr. Barnett issued a summary report on May 8, 2007. AR 237-239. His mental status exam opined that Plaintiff would be able to understand and remember simple or complex work-related instructions and tasks, but would be unable to sustain

13

focused attention and concentration long enough to complete routine work-related tasks in a timely and appropriate way without special or additional supervision. AR 239. He further opined that Plaintiff would have difficulty being able to interact independently, appropriately, and effectively with coworkers, supervisors, and the public, and would have difficulty adapting to changes, hazards, or stressors in the work environment. AR 239.

State agency medical consultant Dr. Aquino-Caro completed a mental RFC assessment on June 8, 2007. AR 252-254. The doctor opined that Plaintiff was able to understand, remember, and carry out simple instructions, sustain attention and concentration for extended periods, relate and interact appropriately with limited public contact, and adapt to usual work situations and deal with changes in a routine work setting. AR 254.

Since the opinion of examining physician Dr. Barnett was contradicted by the opinion of state agency medical consultant Dr. Aquino-Caro, Dr. Barnett's opinion can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews,* 53 F.3d at 1043.

The ALJ assigned little evidentiary weight to Dr. Barnett's opinion because: (1) it was inconsistent with the doctor's own findings on the mental status exam; (2) there was no evidence in the record that was consistent with the opinion; (3) the level of Plaintiff's performance on the mental status exam was consistent with an individual who was able to perform the mental functions of work; (4) it was based on Plaintiff's subjective complaints, which are unsupported by objective evidence; and (5) the doctor stated that Plaintiff's symptoms would be relieved by treatment with an SSRI, and that 95 percent of people treated in a similar manner experience relief. AR 19; see also AR 237-239. These reasons constitute specific and legitimate reasons for rejecting Dr. Barnett's opinion. *Andrews,* 53 F.3d at 1043.

Plaintiff argues that her performance on Dr. Barnett's mental status exam was sufficient to support the finding that her memory was intact but insufficient to support the finding that she was able to perform the mental functions of work. This argument is unpersuasive. As the ALJ pointed out, the mental status exam tested not only Plaintiff's memory, but also her ability to do

simple math, identify similarities and differences, and interpret the meanings of proverbs. AR 19; see also AR 238.[7]

Plaintiff further argues that Dr. Barnett's opinion is based on an objective examination, not Plaintiff's subjective complaints. This argument is also unpersuasive. Dr. Barnett did not review Plaintiff's medical records prior to the examination (AR 237 ["There were no records to review prior to the evaluation"]) and his objective examination consisted largely of Plaintiff's mental status, as discussed above. AR 238. It is clear that Dr. Barnett relied in large part on Plaintiff's subjective complaints.

Plaintiff argues that Dr. Barnett's opinion is supported by objective medical evidence and she references a diagnosis of dysthymia. Plaintiff was in fact prescribed Lorcet by Dr. Rudolph to treat her depression. AR 150. However, the mere diagnosis of an impairment is not sufficient to sustain a finding of disability. *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985). The ALJ noted that Plaintiff did not allege depression when she was treated by Dr. Rudolph in March 2006, was not taking any psychotherapeutic medication when she saw Dr. Feng in June 2006, declined to take an SSRI in November 2007 because she felt she could manage without it, and felt more energized after her thyroid operation. AR 19-20; see also AR 150, 192, 275, 288.

The ALJ assigned greater evidentiary weight to the opinion of the state agency medical consultant because the medical record was reviewed and the opinion was more consistent with Plaintiff's level of functioning and conservative treatment. AR 20.

In sum, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record for his assignment of little evidentiary weight to Dr. Barnett's May 8, 2007 summary report in favor of Dr. Aquino-Caro's June 8, 2007 mental RFC assessment. Thus, no error occurred.

### B.   *Use of Medical-Vocational Guidelines*

Plaintiff argues that the ALJ erred in concluding that her limitation regarding public contact has little or no effect on the occupational base of unskilled light work without hearing

---

[7] The court notes that the mental status exam also tested Plaintiff's ability to react logically to situational events, such as a fire in a movie theater and finding a stamped, addressed letter laying on the sidewalk. AR 238.

from a VE. Defendant argues that the ALJ was permitted to rely on the Medical-Vocational Guidelines ("the grids") to find Plaintiff not disabled.

The claimant has the initial burden of proving the existence of a disability within the meaning of the Social Security Act. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). The claimant establishes a prima facie case of disability by showing that a physical or mental impairment prevents him or her from engaging in his or her previous occupation. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f). However, once the claimant establishes a prima facie case of disability, the burden of going forward with the evidence shifts to the Secretary. *Hammock v. Bowen*, 867 F.2d 1209 (9th Cir. 1989). The Secretary bears the burden of establishing the existence of alternative jobs available to the claimant, given his or her age, education, and medical-vocational background. In an appropriate case, the Secretary may meet this burden through application of the medical-vocational guidelines set forth in the regulations.[8] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 ("Appendix 2"); *Heckler v. Campbell*, 461 U.S. 458 (1983); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983). If the guidelines do not accurately describe a claimant's limitations, the Secretary may not rely on them alone to show availability of jobs for the claimant. *Desrosiers v. Secretary*, 846 F.2d 573 (9th Cir. 1988). However, the mere allegation of the presence of a non-exertional impairment is not sufficient to preclude application of the guidelines. Such non-exertional impairment must be found to significantly limit the range of work permitted by a claimant's exertional limitations before the Secretary will be required to obtain expert vocational testimony regarding the availability of other work. *See, e.g., Polny v. Bowen,* 864 F.2d 661 (9th Cir. 1988); *Burkhart v. Bowen*, 856 F.2d 1335 (9th Cir. 1988); *Razey v. Heckler*, 785 F.2d 1426, 1430 (9th Cir. 1986) (modified 794 F.2d 1348 (1986)); and *Perminter v. Heckler*, 765 F.2d 870 (9th Cir. 1985).

---

[8] For any given combination of factors (residual functional capacity, age, education, and work experience), the guidelines direct a conclusion of disability or nondisability when they accurately describe a claimant's particular limitations.

Here, the ALJ found Plaintiff had the RFC to perform unskilled light work with the non-exertional limitation that she requires a job with limited public contact. AR 16. He further found that this limitation had little or no effect on the occupational base of unskilled light work. AR 22. The ALJ applied the medical-vocational guidelines as a framework and determined that jobs exist in significant numbers in the national economy that the Plaintiff can perform. AR 22. Plaintiff cites no facts in the record that support a finding that her non-exertional limitation significantly limited the range of work permitted. In addition, Plaintiff has failed to provide legal authority that supports a requirement of VE testimony in circumstances where a non-exertional limitation does not significantly limit the occupational base.

In support of Plaintiff's argument that the ALJ erred in failing to obtain testimony of a VE, Plaintiff points out that the ALJ found her dysthymia to be "severe" at step two (see AR 15). However, Plaintiff fails to establish the relevance of this finding to the ALJ's analysis at step five.

> . . . [A] step-two determination that a non-exertional impairment is severe does not require that the ALJ seek the assistance of a VE at step five.
> At step five [VE] testimony is required when a non-exertional limitation is "'sufficiently severe' so as to significantly limit the range of work permitted by the [Plaintiff's] exertional limitation." (Citation). The step two and step five determinations require different levels of severity of limitations such that the satisfaction of the requirements at step two does not automatically lead to the conclusion that the [Plaintiff] has satisfied the requirements at step five.
> . . . satisfaction of the step-two threshold requirement that a claimant prove her limitations are severe is not dispositive of the step-five determination of whether the non-exertional limitations are sufficiently severe such as to invalidate the ALJ's exclusive use of the grids without the assistance of a vocational expert. Instead, an ALJ is required to seek the assistance of a [VE] when the non-exertional limitations are at a sufficient level of severity such as to make the grids inapplicable to the particular case.

*Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (also noting that the Ninth Circuit had not previously held mild or moderate depression to be a sufficiently severe non-exertional limitation that significantly limits a claimant's ability to do work beyond the exertional limitation).

Although the ALJ in *Hoopai* did identify three specific jobs that existed in the national economy that were available to the plaintiff, the ALJ relied on the Dictionary of Occupational

Titles,[9] which is part of the grids and thus part of the record. *Hoopai*, 499 F.3d at 1077; *see also* 20 C.F.R. § 404.1569. In the instant case, the ALJ was not required to identify specific jobs that Plaintiff could perform. Reliance on the grids was sufficient for a finding of disability. *Heckler v. Campbell*, 461 U.S. 458, 470 130 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (expressly rejected the requirement of the Secretary to introduce evidence about the availability of specific jobs for which the claimant is capable of performing where the grids apply).

In sum, the ALJ appropriately relied on the medical-vocational guidelines in finding Plaintiff not disabled and the ALJ did not err by failing to obtain the testimony of a VE.

## RECOMMENDATION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and against Plaintiff Richelle A. Barker.

These findings and recommendations will be submitted to the Honorable Anthony W. Ishii pursuant to the provisions of Title 28 of the United States Code section 636(b)(l). Within fifteen (15) days after being served with these findings and recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **June 13, 2010**        **/s/ Gary S. Austin**
                                UNITED STATES MAGISTRATE JUDGE

---

[9] The Dictionary of Occupational Titles includes information about jobs (classified by their exertional and skill requirements) that exist in the national economy. 20 C.F.R. § 404.1569.